**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NAOMI ARRELLIN,

                    Plaintiff,

v.                                                   No. CIV 01-1375 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFF'S MOTION TO REVERSE AND REMAND

Plaintiff Naomi Arrellin ("Arrellin") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Arrellin was not eligible for Supplemental Security Income or Childhood Disability benefits. Arrellin moves this Court for an order reversing the Commissioner's final decision. [Doc. 9.]

Arrellin was born on October 7, 1978. She was healthy and robust during her early childhood, and prior to age 11 was a very good student. In late 1989, when she was 11 years old, Arrellin was diagnosed with a potentially devastating form of tuberculosis known as tuberculous meningitis ("TBM"). She was hospitalized at University of New Mexico Hospital ("UNMH") for 22 days, and claims that she was in a coma during part of that time. A subsequent EEG showed generalized cerebral dysfunction. [Tr. at 356.] MRI testing revealed lesions and abnormal increased signal functioning in Arrellin's brain. Prior to her illness (from kindergarten through fourth grade), Arrellin

was a very good student.  At some point after her illness, she encountered many difficulties, both with school and otherwise.  She completed the fifth grade and took some classes in sixth, seventh, eighth and possibly ninth grades but apparently did not complete any of those grade levels.  She dropped out of school a number of times and never attained her G.E.D.  In short, Arrellin alleges that she has never been the same since her illness and is unable to hold a job.  She was 21 years old at the time of the administrative hearing.

In March 1992, Arrellin, through her parents, filed an application for SSI.  Arrellin was then 13 years old.  She alleged impairments of meningitis and mental problems.  [Tr. at 54, 72.]  On September 16, 1992, Arrellin was granted SSI due to a finding that she suffered from an organic personality disorder that met the childhood Listing criteria of 112.02 ("organic mental disorder").  [Tr. at 71.]  Her disability was effective on March 1, 1992.  [Tr. at 71.]

On October 7, 1996, Arrellin reached age 18, and her disability case was again reviewed  in accordance with the adult standards of disability.  *See* 20 C.F.R. §§ 404.350, 416.987.  Upon re-determination, Arrellin was found not disabled under adult standards, and her disability benefits ceased, effective August 1, 1997.  [Tr. at 88, 103.]  On June 5, 1998, Arrellin moved for reconsideration.  [Tr. at 111.]  On April 1, 1999, a social security disability officer held a hearing, at which Arrellin was present with counsel.  [Tr. at 103.]  The disability officer held the hearing open pending receipt of some additional psychological testing.  [Tr. at 101.]  Psychological examinations were scheduled and re-scheduled for Arrellin but she did not show up for testing.  [Tr. at 106.]  Thus, the state hearing officer closed the proofs and made a finding of no disability based on insufficient evidence to determine current severity or possible medical improvement.  [Tr. at 106, 109, 124.]

After Arrellin's application for SSI benefits was denied at the initial and reconsideration stages, she sought timely review from the ALJ.  [Tr. at 127.]  An administrative hearing was held on May 3, 2000.[1]  [Tr. at 405.]  Arrellin attended with her mother and a non-lawyer representative from the Legal Aid  Society of Albuquerque.  In a decision, dated July 26, 2000, ALJ Paul Keohane found that Arrellin was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit requests.  [Tr. at 15-31].  Arrellin challenged this determination to the Appeals Council which denied her request for review on October 26, 2001.  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three,

---

[1]At least one ALJ hearing was scheduled earlier at which Arrellin did not appear.  She claimed not to have received notice early enough to attend.  Her legal representative also claimed not to have received the first notice of hearing.

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids."  Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy.  Id. at 669-670.  In this case, the ALJ utilized a vocational expert.  However, Arrellin challenges only one aspect of the ALJ's decision –  his Step 3 finding that she did not meet Listing 12.02.

## Standard of Review and Allegations of Error

---

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Arrellin's medical records, symptoms and complaints, Judge Keohane concluded that Arrellin had a severe combination of impairments related to residual effects of the TBM, organic delusional disorder and organic personality disorder, "as well as alcohol and cannabis

abuse." However, he found that none of these disorders or a combination thereof met or equaled a Listing. [Tr. at 17.] The ALJ further found that she had a residual functional capacity for a wide range of exertional work activity despite moderate limitations in concentration, persistence and pace and work in the presence of co-workers and the general public. [Tr. at 29.] Judge Keohane adopted the vocational expert's opinion offered at the hearing that Arrellin could make a satisfactory adjustment to a significant number of jobs in the national economy, including the jobs of kitchen helper, hand packager, bench assembler and hotel maid. [Tr. at 30.] Thus, the ALJ concluded that Arrellin was not under a disability as defined by the Act. [Tr. at 31.]

In this appeal, as stated previously, Arrellin asserts only one reason why this case must be reversed and/or remanded. She claims that the ALJ's step 3 analysis was improper and that her condition met the adult Listing criteria for 12.02 (Organic Mental Disorders). [Doc. 9.] The Commissioner argues that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 13.]

After a review of the entire record, this Court recommends, for the reasons set out below, that this case be reversed and remanded for an immediate award of benefits.

## Summary of Arrellin's History and Medical Care

In November 1989, Arrellin was 11 years old and doing well in school. Her school summaries for the first four grades were very good. [Tr. at 365.] She claims she was a straight-A student. In November 1989, she became ill and went to UNMH, complaining of a 6-day fever, vomiting, and neck ache. She was described as pale and fatigued. [Tr. at 351.] Beginning on November 22, 1989, she was hospitalized for 22 days. While her diagnosis was unclear at first, she eventually was diagnosed with TBM.

Tuberculous meningitis is a rare, but life-threatening form of tuberculosis. It commonly produces one or more of a wide variety of neurological signs and symptoms, usually due to adhesions, infarction, or edema. [Tr. at 381.] Early recognition and prompt treatment are critical, but diagnosis may be difficult. [Tr. at 384-85]. Without early diagnosis and treatment, there is a real risk of irreversible neurological damage. In stage I of the disease, consciousness is undisturbed and no focal neurological signs are present; in stage II, consciousness is disturbed but the patient is not comatose; in stage III, patients are in a coma or without focal neurological signs. [Tr. at 385.] The brunt of the effect of TBM falls on the basal meninges and cerebrum. Successful treatment may consist of antituberculous chemotherapy, various medications, a judicial use of corticosteroids, and/or surgery.

The detailed hospital treatment records for Arrellin apparently are unavailable. There are a few outpatient records when she first appeared at UNMH, and the subsequent MRI and EEG reports. The December 1, 1989 EEG shows generalized cerebral dysfunction, decreased level of consciousness and presumed non-bacterial meningitis. [Tr. at 356.] The EEG results were described as moderate to markedly abnormal. Some severe dysfunction in Arrellin's right temporal region and frontal lobes was observed. Page 1 of the December 11, 1989 MRI is missing, but page 2 shows multiple areas of signal abnormality. [Tr. at 352.] A December 19 record states that she has probable TBM. [Tr. at 350.] A second MRI on December 20 shows a larger lesion on the right hemisphere of her brain than was apparent on the prior study. Hemorrhaging was suggested, along with basar meningitis. A new area of disease was present. The reports also state that the results might show meningitic disease. [Tr. at 346.]

Arrellin was discharged on December 14, 1989 according to a January 1990 record. [Tr. at 343]. A January 11, 1990 medical records show that Arrellin no longer had a fever and was

improving.  [Tr. at 341.]  She had no headaches, and her appetite was good.  She was anxious to return to school.  She was "greatly improved since discharge," although the records indicate that her diagnosis still was not clear.  [Tr. at 343.]  A January 19 MRI shows increased signal in her right temporal lobe and that the lesion had increased in size.  These findings were consistent with basilar meningitis and with TBM.  [Tr. at 344.]

On February 22, 1990, she was making a good clinical recovery and showed a "full range of intelligent conversation."  She was taking three drugs at that time.  [Tr. at 342.]  A June 11 MRI shows that the abnormal signals in her right basal ganglia had markedly decreased since her last study.  This was probably an area of hemorrhage that was resolving.  There were still lesions present and abnormal increased signal.  [Tr. at 340.]

On June 28, 1990, she had no complaints.  The physician noted that she was taking some summer school classes and doing all right, although she had concentration problems.  [Tr. at 338.]  Dr. Winter's June 28 medical report documents that she was profoundly affected with her meningitic disease in 1989, but that she regained much of her function during her recovery.  Dr. Winter noted, however, that she had a great deal of trouble with concentration and irritability.  Nonetheless, the specialists thought she was making an excellent recovery.  While there was some thought about placing her in special education, the medical specialists were hesitant to make such a recommendation based on her continuing excellent clinical recovery.  They believed she would enjoy a complete recovery.  [Tr. at 337.]  The medical specialists were apparently unaware that Arrellin had already been referred by the schools for special education testing.  [Tr. at 207.]

In November 1990, she had another MRI that showed a ring enhancing lesion in her right temporal lobe.  [Tr. at 339.]  The results of her earlier special education testing were presented in a

8

November 29, 1990 report.  She received a full scale score of 89 on the WISC-R.  This placed her in the low average classification.  That score provided an assessment of general intelligence and scholastic aptitude.  Her verbal IQ score was 85, and her performance IQ was 96.  This testing was ordered due to concerns with her general academic progress and oral language use.  [Tr. at 207.]  The results, however, did not warrant a conclusion of exceptionality.  [Tr. at 216.]

On December 18, 1990, she was referred for a speech and language evaluation due to concerns with her memory.  This test showed adequate speech and intelligibility.  Her attention and cooperation were normal.  The results showed moderate auditory processing deficits characterized by difficulty understanding more complex or lengthy information.  She exhibited excellent knowledge of single word vocabulary.  She displayed difficulty formulating sentences requiring increased grammatic complexity.  She had marginal verbal reasoning skills and deficit word retrieval skills  [Tr. at 198.]

Her grades for the year 1990/91 were mostly D's or D-'s.  She also earned a C, F, and A in some courses.  [Tr. at 361.]  Her grades for 1991/92 were mostly F's, D's or C's.  [Tr. at 359.]

A January 3, 1991 medical record documents that Arrellin completed her TB medication in October 1990.  She was having headaches then.  She continued to have problems with her education.  She appeared, however, clinically well and "very bright, articulate" and in no distress.  [Tr. at 335.]

In February 1991, there is a UNMH medical report relating to a sexual abuse exam for Arrellin.  She was there with her mother and reported sexual abuse from ages 7-10, prior to her illness.  She provided significant detail about sexual abuse by a male who lived on the streets but came to her home.  She also described a rape by a stranger in a van.  [Tr. at 330.]  The physical exam established evidence consistent with her allegations.  [Tr. at 330.]

On August 20, 1991, she had a yeast infection but denied sexual activity.  On September 3, 1991, her pregnancy test was positive.  [Tr. at 332.]  She was 12 years old then.  On September 5, she told medical care providers that she had had intercourse in July but never before that.  [Tr. at 326.]  She had an abortion, and in the post-pregnancy termination exam denied that she was sexually abused.  [Tr. at 324, 329.]

On February 28, 1992, she was again pregnant.  [Tr. at 327.]  A February 28 medical record documents that she stated she was sexually abused by her father for 8 years.  [Tr. at 328.]  She was admitted to a shelter for history of abuse.  She believed at this time that her boyfriend was the father of her child.  Although it is not clear, this pregnancy may have ended in a miscarriage.  It also is unclear how many times Arrellin became pregnant in her teenage years.

In early March 1992, she filed an application for childhood disability benefits.  [Tr. at 71, 74.]  Her mother stated that Arrellin did not attend school, did not stay home long enough to do chores, did not take a shower unless reminded, walked the streets and told stories to everyone.  [Tr. at 74.]  On March 5, 1992, Arrellin sought treatment for a fever and bad cough.  She told medical care providers about her history of TBM and that she had been in a coma for 8 days.  [Tr. at 322.]  Her mother stated that Arrellin had never been the same since.

The March 1992 disability forms state that Arrellin had trouble sleeping, was nervous around kids, was very sexual, often ran away, was forgetful, hated everybody, had no friends, needed a lot of counseling and was earning F's in school.  [Tr. at 81.]

On April 2, 1992, she complained of headaches and a sore neck and back.  The medical care provider thought her complaints were possibly post-meningitis complications or possible hydrocephalus.  [Tr. at 320.]  An April 6 MRI showed a residual of prior hemorrhages and

10

calcification.  There was an absence of a normal appearing right caudate head.  There was an area of gliosis or encephalomalacia.  There were high signal areas that most likely represented an area of hemorrhage.  The area of abnormal signal had decreased in size, but abnormalities were still shown. [Tr. at 318.]

On April 16, Arrellin visited UNMH for family planning.  She reported having had unprotected sex.  [Tr. at 305.]

On April 24, 1992, she was seen at the UNM Mental Health Center.  Her family reported that they had witnessed a dramatic personality change in Arrellin since her illness.  Arrellin reported that since "coming out of the coma," she had been moody, upset and depressed.  In addition, she was irritable, sad, and tearful.  She had increased sexual interest and activity.  She had angry outbursts. She felt that life was not worth living and had increased thoughts about death.  She initially denied drug use.  She stated that she had a boyfriend and had dropped out of 7th grade.  She told the provider that she had "troubles" and wanted help even if it meant going into the hospital.  The record notes that Arrellin was "nicely casually dressed," with hickeys on her throat.  She seemed fairly bright and had adequate judgment.  [Tr. at 289.]

On April 24 until June 2, 1992 she was voluntarily admitted for organic delusional disorder, depression, organic personality disorder and status post TBM.  [Tr. at 161.]  Upon arrival, her drug screen was negative.  [Tr. at 303-12.]  The discharge summary shows that meningitis affected her right caudate basal ganglia and temporal lobe.  She was admitted for further evaluation and possible treatment of dramatic personality changes that occurred after her illness.  She was irritable, tearful, depressed, had run away from home, had dropped out of school, saw flashing lights and smelled "funny smells."  [Tr. at 161.]  Prior to her illness, she was described as happy, helpful, a straight-A

11

student with many friends, obedient and cooperative.  The review of her MRI revealed a good deal of scarring.

When first admitted, her affect was very flat and blunted.  She appeared depressed.  She attended a number of group therapy sessions during her hospitalization.  Notes from those sessions indicate that she engaged in flirtatious behavior with a number of the males on the ward.  She also requested to bathe three times a day, and appeared to have "bizarre and poorly explained preoccupations."  She spoke of plans to run away.  She appeared impulsive and demonstrated a remarkable degree of poor judgment.  [Tr. at 286.]

Her EEG results were normal, but further neuropsych testing was to proceed during her stay.  [Tr. at 286, 288.]  She refused to stay in her room and was showing a fair degree of disorganization.  She appeared more psychotic than initially expected.  A "remarkable amount of lying behavior" was exhibited as well.  [Tr. at 283.]  She discussed a previous suicide pact with a boyfriend, but her tendency to fabricate made her stories questionable.  Initially, she required constant supervision.  She needed her room search done routinely because her capacity for controlling her impulses and telling the truth were markedly limited.  Dr. Davis, Director of the Adolescent Unit of UNM Mental Health Center, reported that her mental status seemed secondary to organic damage from her TB.  [Tr. at 278.]

She was started on Navane for her loose and disorganized thought processes.  She felt the medication was helpful and cleared her thinking.  [Tr. at 162.]  She was also started on Tegretol for her impulsive behavior and for mood stabilization.  Dr. Davis noted there was some subjective improvement in her confusion and impulsivity from Tegretol but that her impulse control was only marginally better with the medications.  [Tr. at 274, 275.]  On May 26, 1992, she was still showing

12

inappropriate behaviors that were believed to be related to the meningitis. "Neither medications nor a very strict behavioral program have been able to eradicate certain of these behaviors." [Tr. at 272.]

During her hospitalization, neuropsych testing was performed on May 8, May 11, May 20 and May 23. Dr. Davis referred her for these tests in an attempt to discriminate between psychological symptoms vs. organically based functional deficits consequent to the prior brain injury. [Tr. at 292.] Arrellin reported that she had a "big ball of problems in her head" that she could not separate from each other.

During testing, Arrellin denied suicidal ideation but said she felt suicidal before coming to the hospital when she was "coming down" from two days of ingesting mixed uppers and downers. She described taking four whites (stimulants), then four reds (depressants) and five more whites before entering the hospital. Such history is inconsistent with the results of her negative drug screen test that was performed when she was admitted. [Tr. at 294.] Arrellin also claimed that she began drinking one beer per day when she was 11 and increased it to 12 beers per day for three weeks. She said that she started smoking marijuana a few months ago (thus, in 1992 sometime), that she began with 2-3 joints per day, and had increased her intake to 4 to 5 bowls per day before entering the hospital. Again, the drug screen was negative for cannabinoids. [Tr. at 309.]

During psychological testing, she recognized that her lying was a problem. She said that her biggest lie during the hospital stay was that she had a child. She admitted she had had an abortion last year that was traumatic. [Tr. at 294.] During the first part of her interview, she denied sexual abuse and hallucinations, but later began to describe her cult experience and hallucinations. She explained that she had gotten pregnant by her boyfriend who pressured her to join a cult. She had had an abortion because he told Arrellin that cult members had to sacrifice their babies. The neuro-

13

psychologist conducting the testing noted that Arrellin's stories about her cult experience were consistent with other adolescents' stories about the same cult. [Tr. at 295.] Babies as well as animals may very well have been sacrificed in the cult. [Tr. at 295.] Dr. Davis commented that while the most prominent feature of Arrellin's presentation was organic deficit, she also showed a history of cult activities and some PTSD symptoms. [Tr. at 272.]

Arrellin's test results placed her somewhat lower than average in maintaining attention. Her intellectual ability was low. She had a full scale IQ of 77 which was in the borderline intellectual range. Her comprehension subtest was unusually low. Arrellin was "missing significant understanding about the world and society around her." [Tr. at 295.] Her reading level was at about a 7th grade level, but her spelling and math were at a 3rd-4th grade level. She had "severe difficulties in learning." The neuropsychologist surmised that what was shown in Arrellin's testing was what she knew prior to her TBM and that she had not learned much since then. [Tr. at 296.] Her verbal functioning was adequate, but she performed "very poorly" on three learning paradigms. Arrellin's spatial orientation was very poor, her memory abilities were low, and she was easily distracted. [Tr. at 297.]

Her Rorschach test responses were consistent with psychotic thinking. The evaluator stated that any desire to dismiss her stories as lies might be an oversimplification. [Tr. at 298.] Arrellin appeared to have significant neuropsychological problems, most likely stemming from brain lesions. Hers, however, were not common lesions. [Tr. at 299.] While she was perhaps experiencing PTSD, she had fewer than normal mechanisms to cope with such challenges. Arrellin needed a lot of extra help in making sense of her experience. [Tr. at 299.]

The neuropsychologist concluded that special classes might assist her, but advised that Arrellin's learning disability was not a normal learning disability encountered by the school system. Her prognosis was "very guarded." [Tr. at 300.]

On June 2, 1992, Arrellin was discharged to her parents. She was improved by her own and her parents' assessment, although she still showed a number of "clear organic deficits" that could not be addressed by medications or behavioral methods. She no longer was a danger to herself. Her parents found that Arrellin was "back to normal" but they also were well aware that she still required close supervision. [Tr. at 162, 266.] Dr. Davis concluded that she was "remarkably improved" since arrival to the hospital. [Tr. at 163.]

On June 16, 1992, she visited UNM Mental Health as an outpatient. She was with her mother, and they both reported she was doing well. She was not running off, was getting along with family members and was compliant with her medications. Arrellin and her mother, however, were upset with Arrellin's father's drinking.

Apparently, shortly after June 1992, Arrellin's behavior again worsened. An August 24, 1992 mental health record indicates that Arrellin did not show up for voluntary admission as arranged on August 21, 1992. The health care provider contacted Arrellin's mother who said that Arrellin was in a shelter. Arrellin's mother stated that the shelter had offered to take Arrellin to the hospital but that Arrellin refused. Her mother knew that Arrellin was not taking her medications appropriately, but did not know what she could do about it. The provider explained to Arrellin's mother that Arrellin was a minor and that the mother had the right to put her in the hospital. She reminded Arrellin's mother that she had promised to bring Arrellin to the hospital. [Tr. at 259.]

15

In September 1992, Arrellin learned that a determination was made granting her disability benefits in accordance with childhood requirements.  The benefits were effective as of March 1, 1992.

In 1993, there are very few health care records.  Arrellin was participating in the Program for Children at UNM Mental Health Center.  [Tr. at 173.]  The program was to try to find an appropriate school for her.  In August 1993, the records show that she had recently enrolled at Rio Grande High School, but was very unhappy with her home situation.  [Tr. at 172.]  An August 24 outpatient records states that she was very happy with the way things were going at school.  She liked her teacher and the small classroom setting.  Her father had checked into Turquoise Lodge for alcohol abuse.  She apparently was having trouble getting a ride to her therapy appointments, even though she had received the SSI benefits and could have paid for a cab ride.  [Tr. at 171.]

A November 15, 1993 case management report reveals that Arrellin ran away from home.  She complained that her parents did not act like they cared about her.  A November 22 records shows that she was having trouble staying at home and was moving in and out of her home.  She was not attending school or therapy consistently.  Arrellin felt that her mother was not sensitive to her needs.  [Tr. at 167.]

On February 28, 1994, a psychological examination was conducted by psychologist Diana Valdez at UNM Mental Health.  Arrellin was 15 then.  She had a GAF of 40.  [Tr. at 178.]  The report indicates that she had been participating in family and individual therapy since November 9, 1992 but that her attendance was sporadic due to her family not bringing her or because of her difficulties in negotiating a taxi to take her.  Her lack of continuity in treatment was due to family stressors, overcrowding in the home, and her mother's limited commitment to Arrellin's treatment.  There were several siblings living at home with their spouses and children.  While Arrellin initially

16

liked school, she became involved with a boy who was not a good influence on her and stopped school. The record indicates that she had attended four middle schools. She recently had a miscarriage.

Arrellin reported alcohol abuse with her cousin. She was not on any medications because of her sporadic attendance in therapy. The case manager tried to make appointments with Arrellin at her home but Arrellin was not present when the case manager arrived. "Because of the lack of support from her family including a minimization of her emotional and significant mental health needs, her progress has been poor." The psychologist recommended placing Arrellin in a residential treatment facility, because without this type of structure, Arrellin was at a high risk for continued mental health and substance abuse problems. [Tr. at 178.]

A March 14, 1994 record shows that Arrellin dropped out of school in February. She was spending time with her cousin who was not in school and engaging in "at risk" behavior. She was referred for residential treatment. [Tr. at 165.]

On April 13, 1994, Arrellin was admitted to UNM Mental Health Center for about 2 ½ weeks in relation to suicidal ideation and related mental health problems. The initial records indicate reports of alcohol and marijuana abuse, running away from home, and truancy. Arrellin complained of overcrowding at her home. Her labs were all normal except for the urine toxicology screens that was positive for cannabinoids. [Tr. at 187.] Arrellin was started on Tegretol and Navane, and appeared to benefit initially but was still delusional when discharged. She showed minimal progress while hospitalized. She received psychotherapy twice a week and family therapy sessions three times a week. She participated in a number of other treatment programs, including AA. The initial family session was attended only by her mother. While her mother understood that Arrellin needed

17

treatment, she was resistant to the inpatient hospitalization.  Arrellin's mother and father attended the remaining family sessions.  Arrellin left on a four-hour pass with her parents and supposedly begged them not to return her.  She was discharged against medical advice, and her parents refused to return her.  [Tr. at 189.]  Her prognosis was poor.

While hospitalized, Arrellin was given another psychological evaluation.  She had a verbal IQ of 70 (low to borderline), and a performance IQ of 86 (low to average).  Overall, her abilities were in the low-average range.  Her logic was poor.  Her perception of the world was peculiar.  She had cognitive slippage and losses in thinking.  Her reality testing was poor and she was easily confused.  She had difficulties with vocabulary and in understanding questions.  She had a history of sexual abuse and reported sexual activity since age12.  The report also indicates that Arrellin was well groomed, cooperative, pleasant and appeared happy.  Group therapy, but not individual therapy, was recommended.  Family therapy was necessary.  [Tr. at 183.]

On June 6, 1994, the case management services for Arrellin were terminated due to her and her family's lack of interest.  [Tr. at 166.]  She had missed several appointments.  Her family had not taken an active role in finding a placement for Arrellin and in fact, had done the opposite by removing her from the hospital against medical advice.  [Tr. at 166.]

There are no records from the year 1995.  In 1996, an APS record indicates that Arrellin's reading level was 8th grade, and her spelling and math were at 5th grade levels.  This record also notes that Arrellin was first evaluated for special education services in 1990 and that her exceptionality was identified as CD-L (this seems contradictory to the testing results found at Tr. 216).  She was again tested in 1992 and identified as "behavior disordered."  In 1995, Arrellin was re-evaluated and identified as "traumatic brain injured."  According to the record, Arrellin was

attending School on Wheels although not attending school at present.  Her mother indicated Arrellin

was not living at home and that she did not know where Arrellin was staying.  [Tr. at 190.]  Arrellin

contacted her mother on occasion and told her that she did not want to return to school.  [Tr. at 191.]

In October 1996, Arrellin turned 18, at which point, her disability had to be re-evaluated to

determine whether she met the adult disability standards.  Childhood disability benefits also could

continued for Arrellin, even after she reached age 18, if she had the disability which began before age

22.  [*See* Tr. at 123.]  However, any alleged disability still had to be evaluated under the five step

sequential process outlined in 20 C.F.R. § 416.920(c)-(f).  20 C.F.R. 416.987 (b).

On July 3, 1997, Arrellin was given a psychological exam for purposes of her adult disability

determination.  Dr. G. Michael Dempsey performed the exam.  Based on his report, it appears that

Dr. Dempsey performed minimal testing and relied on a prior psychological report of Aligio Padilla

Ph.D., dated January 15, 1997, that is not part of this record.  [Tr. at 222.]  Arrellin was estimated

to have a GAF of 55.  [Tr. at 223.]  She was unemployed and living with her mother.  She stated that

she had problems learning ever since suffering from TBM.  She was not on any medications and did

not see a regular physician.  She was never treated for drug or alcohol problems.  She complained

that she did not sleep well and that her appetite was poor.  She had no energy, slept during the day,

had no interest in things, was more angry than depressed, was anxious all of the time and sometimes

irritable.  She denied hallucinations.  She stated that she got along with people "pretty good."  She

last worked at Mac's Steak in the Rough for 7-10 days but could not learn the menu or cash register.

She said she could not drive.  She lost her purse frequently and bought unnecessary items.  She swam

and occasionally went out on dates.  She did not drink and denied doing illicit drugs.  The record

notes that Arrellin was "fashionably dressed," and that her affect was normal.

19

It appears that the only prior record reviewed by Dr. Dempsey was Padilla's psychological report.  According to Dr. Dempsey, Dr. Padilla's report indicated that Arrellin's prognosis was guarded and that she seemed to have forgotten much of what she learned in elementary school.  She appeared anxious and irritable to Padilla, and lacked confidence in her ability to perform work satisfactorily.  [Tr. at 222.]  Padilla's report apparently indicated that Arrellin had worked at Cottonwood Mall during Christmas and did well enough to be considered for full-time employment and a promotion.

Dr. Dempsey diagnosed her with cognitive disorder, NOS secondary to a general medical condition.  She was "status post TBM" with a history of residual learning disability.  She was significantly impaired in social and occupational functioning on Axis V.  Arrellin reported no impairment in bathing, dressing and feeding herself.  She did not drive, did not shop alone and could not maintain personal finances.  Dr. Dempsey noted that Padilla's comments also indicated that Arrellin was "unusually well kept".  Her socialization skills, unlike the Axis V diagnosis, were mildly impaired according to Dr. Dempsey.  She reported a significant impairment in pace, persistence and concentration.  Her adaptation to stress was mild to moderate.  [Tr. at 223.]

On August 4, 1997, J. LeRoy Gabaldon, Ph.D., a consultant for the SSA, filled out a medical assessment form concluding that Arrellin's impairments were not severe.  It is not clear what evidence Gabaldon reviewed, and some of the material he did review is not consistent with his conclusions. For example, he found that Arrellin had a ninth grade education which is not supported by the record, although she may have been enrolled in ninth grade classes for a short time.  [Tr. at 226.]  He found no evidence of an organic mental disorder (12.02), although Arrellin previously had satisfied the similar childhood listing for 112.02.  He concluded there was evidence of a learning disability and no

20

evidence of substance addiction disorders.  The finding concerning no evidence of substance addiction contradicts Arrellin's prior reports of amphetamine, marijuana and alcohol use.  He determined that she had slight limitations on her daily life activities, social functioning and concentration, persistence or pace (known as the "B Criteria").  The "slight limitations" conclusion is not supported by the record.  Gabaldon determined that Arrellin never had any episodes of deterioration or decompensation in work or work-like settings.  [Tr. at 232.]  Again, this conclusion appears unsupported by the record evidence.

Apparently based on these two reports, the Social Security Administration denied Arrellin's adult disability claim on the grounds that her mental impairment was no longer severe.

Other than Arrellin's request for reconsideration in 1998, there are no other records during that year.  On January 15, 1999, she was given a second psychological evaluation by the Social Security Administration.  [Tr. at 234.]  Dr. John R. Harris performed this evaluation.  Arrellin was 20 years old.  It appears that Dr. Harris reviewed some of Arrellin's prior medical records or evaluations.  [Tr. at 235.]  She reported to Dr. Harris that she was chronically and intermittently depressed and suicidal for the past eight years, since suffering from TBM which had resulted in "significant brain damage and profound decrement in intellectual abilities."  [Tr. at 234.]  Arrellin told Dr. Harris that she had been in a coma for several weeks with TBM, and performed poorly in school after the illness.  Prior to TBM she said she had ambitions to be an attorney or doctor but since the illness was very discouraged about her prospects in life, very frustrated and often angry.

Arrellin complained of auditory and visual hallucinations, but denied paranoia.  She denied obsessive/compulsive rituals but was preoccupied with the sense of loss of her potential after the TBM.  She claimed never to have been prescribed psychiatric medications outside of her

hospitalizations and never took any anti-depressant medications.  While Dr. Valdez had prescribed some type of medications for her previously, she did not take them.  Arrellin could not explain why she did not take the medications or why she had not sought further psychiatric help.

Arrellin noted significant memory difficulties that remained unchanged over the years since her illness.  She said that she lost things, could not remember directions and frequently got lost.  She was unable to drive for that reason.  She had problems with learning and could not reason things out.  She denied alcohol use and said she occasionally used marijuana.  She was living with her parents and had no children.

Arrellin attempted several different jobs which never lasted long.  She could not remember the details of her job responsibilities and usually quit in frustration or anger.  It was unclear if she had been fired from some of these jobs.

Dr. Harris reported that Arrellin is attractive, very neatly dressed, and quite well-groomed.  She spoke without revealing any thought disorder or psychotic symptoms.  She was responsive, cooperative and calm.  She seemed sad and preoccupied with the loss of her previous mental abilities and the loss of her life plans.  She was able to add and multiply but could not subtract or divide.  Her abstract thinking was "quite good."

Dr. Harris concluded that Arrellin may have had a major depressive episode(s) in the past.  She seemed to have a cognitive disorder of some sort related to brain damage which appeared to "have significantly affected memory and thinking ability."  [Tr. at 239.]  He recommended that Arrellin seek psychiatric help, particularly with respect to anti-depressant medication.  He also suggested that she seek out rehabilitation aid and evaluation of her memory loss.  [Tr. at 239.]

On January 25, 1999, William Hunter, M.D., filled out another Psychiatric Review form for the SSA. [Tr. at 240.] He concluded that there was nothing in her psychiatric evaluation to suggest a severe impairment. He appeared to follow the evaluation performed in 1997. [Tr. at 241.] He found no restrictions on her daily life activities, slight restrictions in social functioning and concentration. [Tr. at 247.]

On April 1, 1999, the state disability officer held a hearing on Arrellin's request for reconsideration of the denial of her benefits. Arrellin discussed her inability to hold a job due to her lack of memory. She had been able to do some filing at a hospital if she had the alphabet before her. She tried to attend TVI to obtain her G.E.D., but failed the pre-GED math courses. Her daily activities included watching soap operas but she said she did not understand what was going on. She tended to forget things like turning off the stove. She liked to go for walks. She was pregnant at this time and was scared of raising a child. She could not recall who the father was because she was sleeping with three men at the time. [Tr. at 104.] The hearing officer held the hearing open for further testing, but Arrellin missed two scheduled exams. Thus, her claim was denied for insufficient evidence. [Tr. at 109.]

After requesting a hearing by the ALJ, Arrellin's father filled out a function report for her stating that she could shop but only with a list. She tried to do her own banking but became overdrawn. She could not pay her own bills or count change. She had lost six or seven jobs due to her lack of memory. Arrellin did not show up for the first ALJ hearing that was scheduled and later explained that she had not received the notice in time to attend. [Tr. at 51.]

On May 3, 2000, a one-hour ALJ hearing was held. Arrellin and her mother testified. Arrellin's child was about nine months old at this time. Arrellin testified that her mother took care

23

of the child and that Arrellin could not handle the stress of child rearing.  Arrellin moved around and did not live anywhere.  She testified that she could not do day-to-day math, could not work, could not remember daily tasks.  She had no physical problems and last saw a doctor in 1994. She took no medications and did not like the side effects of Tegretol.  She did not attend counseling.  She had stopped using any illegal drugs when she became pregnant.  She testified that she never used alcohol. [Tr. at 416-17.]  She felt very tired and slept 12 hours per night.  She did not shop or do house work. She could not cook and had no hobbies.  She watched soap operas.  She tended to forget things and get lost.  For example, she forgot the appointment she had with her legal representative on the day before the hearing.  [Tr. at 425.]

Arrellin testified that she could not perform job tasks.  She also could not get along with co-workers because she became angry easily and walked off the job.  She gave up on mental health care because she felt that they did not believe she was capable of doing anything with herself.  [Tr. at 425.]

In a lengthy and detailed opinion, ALJ Keohane found that Arrellin was not disabled.  [Tr. at 15.]  The ALJ carefully discussed a number of the early medical records at length.  [Tr. at 18-23.] Judge Keohane concluded that Arrellin's serious impairments did not meet a Listing based on his finding that she did not satisfy the "B" criteria.  The ALJ appeared to focus, in part, on Arrellin's use of drugs or alcohol, even though few questions were asked about substance abuse during her hearing. The ALJ was also concerned with "the theme" that Arrellin did not take her medications or participate in rehabilitation.

Judge Keohane did not find Arrellin fully credible as a witness.  He reasoned, in part, that the early records after her illness predicted a full recovery and that early testing revealed difficulties only with more complex types of information.  The ALJ implied that Arrellin's problems really began after

24

she started using drugs and alcohol and participated in a satanic cult. [Tr. at 27.] He states that Arrellin's conduct was consistent in one way – lying, "particularly after she began the consistent use of drugs and alcohol." [Tr. at 27.] For that reason, he was "highly suspicious" of her stated limitations, which he found exaggerated for her own purposes. In addition, Judge Keohane found that Arrellin's failure to continue with recommended treatment of any type undermined her credibility as to functional limitations. [Tr. at 28.]

Finally, the ALJ found that the "critical issue in this case" was whether she ceased abusing alcohol and drugs. [Tr. at 28.] Judge Keohane found "consistent mention" of Arrellin's involvement of "alcohol, marijuana, stimulants and depressants in the records." He concluded that Arrellin had recovered from the physical effects of her TBM in 1990, and then began abusing alcohol and/or drugs which led to the problems she encountered. [Tr. at 29.]

## Discussion

This case is difficult and troubling for many reasons. The Court first notes that a number of medical records and school documentation are mentioned in other records but not part of this administrative record. For example, critical medical records from Arrellin's hospitalization in 1989 are apparently not available. Thus, it is impossible to know the extent of Arrellin's illness, the symptoms she exhibited for 22 days in the hospital, how she was treated, whether rehabilitation in addition to a regimen of medications was prescribed, or whether medical personnel considered her illness to have been Stage I, II or III of TBM. In addition, Arrellin did not appear to have a consistent treating physician for any length of time, and no treating physician evaluated her to determine whether she might have had lasting neurological damage from the TBM. Certainly, however, there is objective medical evidence of organic mental deficits resulting from the TBM.

There are also references to opinions of medical experts who may have examined Arrellin in 1989 or 1990, and no related medical reports from those experts.  There are references to therapy appointments and yet no corresponding records.  In addition, Dempsey discussed and apparently relied on portions of a report of a psychological exam performed in January 1997 by psychologist Aligio Padilla that was not part of the administrative record.  It is not known why Arrellin was evaluated by Padilla in January 1997 or who may have referred her for that exam, nor are Padilla's conclusions or diagnoses part of this record.

There are references to special education testing that apparently occurred, but for which there are no records.  Also, Arrellin was successful in obtaining several different jobs, and yet there are no employment records that might explain what problems she encountered with maintaining those positions.

The administrative law hearing conducted by Judge Keohane also provides little assistance in the evaluation of this matter.  Portions of the hearing are transcribed as "inaudible," both with respect to Arrellin's answers and the ALJ's questions.  At one point, Judge Keohane asked the following question:

> ALJ: You talked about memory problems.  Sometimes when we talk about memory we talk about concentration also.  By that we mean (inaudible).  People in here are saying you're just out of control because of drugs.  What do you think about that?
>
> Arrellin: I don't really think that's an issue right now.
>
> ALJ: What they're saying, and you can tell me what you think about it, is that if you didn't use drugs and you got some psychological treatment and took the medication the doctors tell you to take, what do you think?
>
> Arrellin: I don't think so.

> ALJ: So how do you know if you haven't tried it?
>
> Arrellin: Because I have tried it.  When I was in the mental health center I quit and I was taking the medication and I was doing everything my therapist was telling me to.  But yet I'm still stuck.  I'm still at the same pace I was before.

[Tr. at 420.]  The Court does not know if the ALJ's questions were correctly transcribed, but they seem incomplete.  In addition, it is unclear to whom the ALJ is referring when he states that "people in here are saying" Arrellin was out of control because of drug use.  The Court has located no such record that anyone was making these allegations about Arrellin's use of drugs.

Moreover, the record of the administrative hearing contains obvious omissions, and it is impossible to know how much of the hearing it is missing.  For example, Arrellin was being questioned by her representative when it appears that some portion of the transcript was omitted.  At page 426 of the record (p. 20 of the hearing transcript), Arrellin began:

> Arrellin: No, because my mom lends me her van to go to my appointments to see you.  And (INAUDIBLE) the other side of Dr. Martin Luther King.  So, I'm like driving around and start going in circles –
>
> (Tape 2, side 1.)
>
> WIT: [apparently now referring to Arrellin's mother]: I feel like hitting her, but I know she is sick to go.  And about a hour later she would go and talk to him real good and
>
> (The witness, ESTHER ARRELLIN, having been first duly sworn, testified as follows:)
>
> EXAMINATION OF WITNESS BY REPRESENTATIVE: [Arrellin's mother's testimony then appears to begin even though a piece of it appeared above as well.]

[Tr. at 426.]  There is no way to make sense of the transcript at this point, although it appears that some portion of Arrellin's testimony is not available, as well as her mother's testimony and the representative's questions to the mother.

Compounding these problems is the fact that Arrellin appears to have been a bright and normal child who did well at school and, by all accounts, was a well behaved child at home until she contracted TBM.  It is clear that Arrellin suffered a serious and potentially disabling disease when she was only 11 years old, and that her life was dramatically and adversely affected.  Her personal care and her medical care, to some extent, appear to have fallen through the cracks.  She presents the serious problems of one caught in an out-of-control vortex that has affected her judgment, memory, decision-making and ability to perform even simple tasks.  She could hardly be faulted, at age 11, for failing to take her medications properly or to seek out adequate medical care, treatment, rehabilitation and follow-up testing.

Further complicating the picture is Arrellin's propensity to tell stories or lies.  Because of her allegations about sexual abuse by a stranger (before her illness) and her own father (also before her illness), it is difficult to know if the abuse happened or what psychological effect any abuse had on her conduct.  What is undisputed, however, is that after her infection and life threatening illness, and while still a child, she was repeatedly sexually abused and impregnated.  None of these issues were raised and clarified during the administrative hearing.

It also appears, based on negative drug testing, that Arrellin lied about her use of drugs prior to admission to the hospital in 1992.  Nonetheless, the ALJ states (citing this 1992 medical record and one other record) that there is "consistent mention" in the record of Arrellin's drug and alcohol use.  This does not appear to be accurate or supported by the record.  Indeed, it is far from clear that

Arrellin was using drugs or alcohol to the extent she said she was.  Either the record is in error to a significant extent or Arrellin is an inaccurate historian and made admissions concerning drug and alcohol abuse that were simply untrue.  If the former, the ALJ may have relied on an inaccurate record; if the latter, Arrellin's inaccurate and untrue statements may well be indicative of her psychological deficits.

Despite significant questions about her drug and alcohol use or abuse, as well as when any substance abuse began, the ALJ clearly concluded that Arrellin's problems were attributable to drug and alcohol use rather than her illness.  For example, Judge Keohane states that the records show Arrellin's problems "were compounded by an increase in marijuana and alcohol abuse from Nov. 9, 1992 through April 1994.  [Tr. at 21, 187.]  Yet, the referenced record does not state that Arrellin actually abused drugs or alcohol during this entire period, and nothing in the record actually supports that she was using both drugs and alcohol for that entire time.  Moreover, the fact that Arrellin's sexual activity and drug/alcohol use began after her illness could be attributed to her illness and related "organic deficits," even though Judge Keohane does not appear to consider this possibility.

Judge Keohane also concludes that Arrellin's one consistent behavior – lying – began after her use of drugs and alcohol [tr. at 27], and yet the record does not provide any concrete information as to when her lying or alleged substance abuse began.  Indeed, the records appear to document that her learning difficulties, running away from home, cult involvement, increased sexual activities, lying behavior, and drug/alcohol abuse all began not long after she suffered from the TBM.

The Court is cognizant that it is not to re-weigh the evidence or substitute its opinion for that of the ALJ.  However, based on the above discussion of the administrative record, this Court cannot conclude that the ALJ's determinations were supported by substantial evidence.

## DUTY TO DEVELOP ADMINISTRATIVE RECORD

"The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." Henrie v. U.S. Dep't of Health and Human Services, 13 F.3d 359, 360-61 (10th Cir. 1993). This is true, even if the claimant is represented by counsel. Id. at 361. That duty is heightened where the claimant represents herself, without counsel. The heightened standard is more applicable here where Arrellin was represented at the hearing by a legal assistant rather than an attorney.

The ALJ's duty in developing the record is to ensure "that the ALJ is informed about 'facts relevant to his decision and the claimant's own version of those facts.'" Id. at 361 (internal citation omitted). Even at step three, where the claimant bears the burden of proof, the ALJ still has a duty of inquiry and factual development. See id. at 361 (discussing step four of the analysis).

Here, at step three, Judge Keohane was persuaded that Arrellin met the "A" criteria of Listing 12.02 related to organic mental disorders. [Tr. at 22.] The "A" criteria require demonstration of a loss of specific cognitive abilities or affective changes, etc. of one of the following: disorientation to time and place, memory impairment (inability to learn new information), perceptual or thinking disturbances, change in personality, disturbance in mood, emotional lability or loss of measured intellectual ability, etc. § 12.02A.

Judge Keohane found, however, that Arrellin failed to meet the "B" criteria of Listing 12.02. [Tr. at 23.] The "B" criteria require at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. § 12.02B. In reaching this determination, the ALJ relied almost exclusively on the two

consultative  psychological examinations performed in 1997 by Dr. Dempsey and in 1999 by Dr. Harris.  Judge Keohane found, based on these reports, that Arrellin was independent in self-care, grooming and hygiene.  [Tr. at 23.]  He further emphasized that the medical consultants regularly described Arrellin to be "well-kept."

The Court does not find substantial evidence in the record for the ALJ's conclusions as to the "B" criteria.  Dr. Dempsey's report shows that Arrellin's mother did the cooking and handled bills and money.  Arrellin tended to lose her purse.  She could not drive.  She watched TV during the day and helped with minor chores.  She held a job for 10 days but could not learn the restaurant's menu or cash register.  [Tr. at 221.]  She could not alphabetize without a printed chart.  She continually forgot appointments, meetings and other obligations.  She would forget to medicate.  She could not perform elementary mathematical functions.  Moreover, Dr. Dempsey's report is cursory and limited, with respect to his review of any medical records.  Dr. Dempsey's "estimate" of her GAF is tentative. Indeed, this 3-page report, that relies on another report not part of the record, does little to support a finding that Arrellin failed to meet the "B" criteria.

The Court also finds that Dr. Dempsey's observations of Arrellin's appearance are unhelpful. The issue here is disability not style.

> She is fashionably dressed with a gold necklace and rings on her fingers.  She is wearing white leather sandals with a lace pattern cut into the leather.  She is wearing short summer Levi shorts and has on a summer top.  Her hair is short, black and curly.

[Tr. at 221-22.]  Whether Arrellin was wearing white sandals with a lace pattern has little to do with a finding of disability.

31

Dr. Harris' report also fails to amount to substantial evidence in support of the ALJ's conclusions. Dr. Harris had some medical reports to review but it is not clear which medical records he may have seen. For example, he states that she was "supposedly" diagnosed with TBM. [Tr. at 236.] His statement supposes scepticism on a matter not even in dispute. He notes that she is unable to explain why she was not willing to take medications and seek psychiatric help or rehabilitation since that time, apparently without factoring in that she was 11 years old when these health and psychiatric questions arose. Dr. Harris did record that Arrellin lost things, had significant memory difficulties, could not remember directions, could not drive due to getting lost, and had problems with learning "as evidenced by her profound decrement in school performance after TBM." [Tr. at 236.] Arrellin did not help much with housework, had very little social life, and had tried a number of different jobs at which she did not succeed. During her interview with Dr. Harris, she could add and multiply, but not subtract or divide. Her abstract thinking was "quite good," but her interpretation of proverbs was concrete. She missed about half of the subtractions on the "serial sevens series." He proceeded to find that she seemed to have a cognitive disorder "of some kind, related to the brain damage suffered . . . ." [Tr. at 239.] Again, the Court does not find this report, along with the Dempsey report, to be substantial evidence in support of the ALJ's findings.

Like Dr. Dempsey, Dr. Harris provided similar comments on Arrellin's appearance.

> The patient is an attractive young woman . . . . She is very neatly dressed and has carefully-coiffured short black hair. She is wearing a black sweater, black slacks, she is wearing a gold necklace and a watch and a couple of gold rings. She seems to be quite well-groomed.

[Tr. at 238.] Dr. Harris's observations about gold jewelry and Arrellin's outfit shed little light on her abilities and/or restrictions. While bizarre attire or conduct of an examinee is noteworthy, the

Doctor's detail on hair color, hair cut, clothes' colors, accessories and so forth seems misplaced. Wouldn't a statement to the effect that Arrellin was appropriately dressed and groomed suffice?

The Court simply is unwilling to examine these two reports of the medical consultants (even if they were substantial evidence in support of the ALJ's findings), without consideration of other more detailed medical reports by physicians who treated and tested Arrellin for longer periods of time. For example, the objective medical evidence (MRI's and EEG) showed that Arrellin suffered cerebral dysfunction and organic brain abnormalities from the TBM. [Tr. at 356, 352, 346, 344, 340, 318.] Dr. Winter found that Arrellin was "profoundly affected" with her TBM. [Tr. at 337.] Within the year after her illness, her school ordered testing with respect to concerns with her learning abilities and memory, even though prior to her illness she was an excellent student. [Tr. at 207, 198.] Her grades dropped significantly shortly after her illness, and those poor grades continued. [Tr. 361, 359.] She went from being an excellent student to a failing one and eventually a drop-out, in short order after her illness. Medical providers surmised that her learning abilities remained, to some extent, at the same level she was at prior to her illness. [Tr. at 162, 296.] Arrellin exhibited significant personality changes after the illness, including increased sexual activity at a very young age and cult participation. One of her few treating physicians noted that the most prominent feature of her presentation in the hospital was "organic deficit." [Tr. at 272.]

In 1992, her comprehension testing was "unusually low." She was missing "significant understanding about the world and society around her." [Tr. at 296.] She appeared to have "severe difficulties" in learning. [Tr. at 296.] Dr. Davis concluded that her neuropsychological problems most likely stemmed from her brain lesions. [Tr. at 298.] Her prognosis was "very guarded." In 1994, her verbal IQ was low to borderline. Her perception of the world was peculiar. [Tr. at 178.]

33

Finally, Arrellin was receiving disability benefits based on her condition during her minority.  While a different test is required for adult benefits, the ALJ may have improperly disregarded the evidence of long-lasting disability and impermissibly focused on alleged drug and alcohol abuse and Arrellin's credibility.

The Court realizes that it has the option to remand this matter for another administrative hearing and additional development of the record.  In reversing the Secretary's determination, the Court has discretion to remand for further hearing "or direct the district court to award benefits." Nielson v. Sullivan, 992 F.2d 1118, 1122 (10th Cir. 1993) (internal citation omitted); Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993); Sorenson v. Bowen, 888 F.2d 706, 713 (10th Cir. 1989).  Where there is substantial evidence of disability and a long delay in the proceedings, the Court also may decide to remand for an immediate award of benefits.  *See* Frazier v. Apfel, 221 F.3d 1351 (Table, Text in Westlaw), 2000 WL 966567 (10th Cir. 2000) (*citing* Harris v. Sec'y of HHS, 821 F.2d 541, 545 (10th Cir. 1987)).

Here, the Court finds substantial evidence of disability based on the records discussed at length above.  In addition, the case has been pending since 1998, and the question of Arrellin's disability has been ongoing since her first application for childhood benefits in 1992.  Thus, the Court decides that this case is in the posture for remand and an immediate award of benefits.

**<u>Recommended Disposition</u>**

That Arrellin's Motion to Reverse [Doc. 9] be GRANTED and that the matter be remanded

for an immediate award of benefits.

_Lorenzo F. Garcia_

Lorenzo F. Garcia
Chief United States Magistrate Judge